MEMORANDUM OF DECISION
 

 MARGOLIS, United States Magistrate Judge.
 

 On June 16, 1993, plaintiff David Carey commenced this § 1983 action against defendant Mark Cassista, a Sergeant in the Connecticut State Police Department, with respect to injuries sustained by him on August 17, 1990, in Chester, Connecticut, from defendant’s police dog, Denver. On December 22, 1995, the parties consented to a court trial before this Magistrate Judge, with any appeal to be taken directly to the Second Circuit. (Dkt. # 33). A bench trial was held on May 13, 14, and 15, 1996. (Dkt. ## 38-40).
 
 [1]
 
 Both parties filed post-trial briefs on
 
 *137
 
 June 13, 1996 (Dkt. ## 45-46); reply briefs were filed on June 24 and June 28, 1996 by defendant and plaintiff, respectively. (Dkt. ## 48-49).
 

 For the reasons stated below, judgment shall enter for defendant.
 

 I. FINDINGS OF FACT
 

 The following constitutes this Court’s findings of fact, pursuant to Fed.R.Civ.P. 52(a):
 

 On Friday, August 17,1990, plaintiff spent most of the day at his home in Middletown, Connecticut, replacing the head gasket of his wife’s car; during the course of the day, he consumed four or five beers. At about 6:30 p.m., he departed his home in his wife’s car, following an argument with her; plaintiff was headed on Route 9 South toward his brother’s home in Chester, Connecticut. After leaving home, plaintiff went to a package store in Middletown and purchased a twelve pack of beer; during his trip, he consumed another two beers.
 

 Plaintiffs wife telephoned the State Police to report that her husband was driving while intoxicated and provided the police with a description of her automobile, including make, model, and license number. This information in turn was broadcasted to all state troopers and local constables in the area. A Chester constable, Charles Vincillette, noticed a vehicle matching this description exit from Route 9 and turn onto Route 148 West.
 
 [2]
 
 Vincillette pulled plaintiffs vehicle over at a Citgo gas station near the intersection of Route 148 and Spring Street. When the constable requested plaintiffs driver’s license and automobile registration, plaintiff responded that his driver’s license was currently under suspension. He did produce, however, the automobile registration. Vincillette instructed plaintiff to remain in his vehicle while the officer verified this information in his cruiser.
 

 Plaintiff testified that he was concerned that he would be arrested and forced to remain in jail for the weekend while awaiting a court appearance on Monday morning. As a result, he bolted from his wife’s car, on foot, into a wooded area near Spring Street. Just before 7:00 p.m., the Chester constable radioed to the State Troopers that he was pursuing this suspect, who had fled on foot. Defendant Cassista and his State Police canine, “Denver,” a German Shepard, were dispatched to provide assistance. Defendant located Vincillette on foot on Spring Street. Vincillette gave defendant a detailed description of plaintiff and then returned to his own cruiser.
 

 Defendant then met with State Police Troopers Julie Martin and David Todd at the Citgo gas station and explained the situation to them. Defendant continued driving on Route 148 West toward the center of town, circling the area on the side streets. Defendant encountered a pedestrian, Minda Loose-more, who resided nearby.
 
 [3]
 
 She explained that she had seen a suspicious man, who matched plaintiffs description, exiting from her neighbor’s garage; the man had run toward Route 148. A second neighbor, Barry Sheldon, also informed defendant that he had seen a suspicious person watching a home on Spring Street.
 
 [4]
 

 After defendant turned his cruiser onto Route 148 West,
 
 [5]
 
 he noticed a man who
 
 *138
 
 matched plaintiffs description walking about forty to fifty yards away along the shoulder of the road near the George E. Abbott & Co., Inc. [“Abbott”]. Defendant immediately radioed Troopers Martin and Todd, informing them that he had located the suspect. Once plaintiff noticed defendant’s cruiser, he ran down Abbott’s driveway.
 
 [6]
 
 Defendant pulled his cruiser into Abbott’s driveway, opened his door, and yelled out loudly, “Stop, State Police!” Plaintiff began to run faster and responded, “Go fuck yourself!”
 
 [7]
 
 Defendant repeated his command. Upon hearing no response, defendant exited from his vehicle and yelled out to plaintiff that if plaintiff did not stop, defendant would release his canine; such a warning is required under State Police procedure. Plaintiff neither responded nor stopped.
 

 Defendant observed plaintiff vault a four-foot wooden fence at the far end of Abbott’s parking lot and then drop out of sight.
 
 [8]
 
 Unbeknownst to plaintiff and defendant, there was a ten to twelve-foot drop behind this fence, into a large grassy field which is surrounded by woods.
 
 [9]
 
 Not knowing whether plaintiff was armed, defendant was hesitant to pursue plaintiff alone in a wooded area. He therefore released Denver,
 
 [10]
 
 with the instruction, “Get him,” which commands the dog to pursue a suspect, bite him at whatever body part is available, and hold him until the canine handler orders the dog to let go. Denver then exited the cruiser through the driver’s door, ran down the Abbott parking lot, vaulted the fence, and then disappeared from sight, just as plaintiff had done seconds before. Troopers Martin and Todd arrived on the scene around the time that plaintiff was leaping over the fence or Denver was being released from the cruiser.
 

 The three troopers immediately ran to the fence
 
 [11]
 
 and observed plaintiff in a crouched position, flailing and thrashing about, struggling with and kicking Denver on the grass below. As plaintiff continued to move, Denver needed to readjust his bite on him.
 
 [12]
 
 Defendant instructed Denver to “break” and ordered him into a “down watch” position. Denver followed these instructions, by letting go of plaintiff and by assuming a prone position alongside him, watching him carefully. Defendant advised plaintiff that if plaintiff did not move, the canine would not attack him. Defendant next headed to a staircase about seven to ten feet left of his position, which led to the field. Trooper Todd noticed plaintiff raise himself on all fours, as if he were going to escape; defendant and Trooper Martin observed this once they reached the stairs.
 
 [13]
 
 Consistent with his training, Denver began to attack plaintiff again, in an attempt to apprehend him. Plaintiff resisted, by grabbing Denver’s jaw, striking him, and kicking him. While he was on the stairs,
 
 [14]
 
 so that plaintiff and Denver were
 
 *139
 
 within defendant’s sight, defendant again gave the “break” and “down wateh” commands; Denver complied.
 

 After the two other troopers reached the bottom of the stairs, they approached plaintiff. Troopers Todd and Martin placed handcuffs on plaintiff and defendant took charge of Denver. While he was being handcuffed, plaintiff continued to flail and scream at defendant to call the dog off, even though the dog was no longer on him.
 
 [15]
 
 Troopers Martin and Todd observed that plaintiff was bleeding from dog bite wounds on his right side and buttocks, so they called for an ambulance and administered first aid to him. An ambulance then transported plaintiff to the Shoreline Medical Clinic in Essex, Connecticut, where he received seventy-six stitches to sixteen distinct puncture wounds or lacerations caused by Denver; these injuries were on the back and front of plaintiff’s legs, his arms, his lower back, and his buttocks. (Jt. Exh. 1; Exhs. 5, 5A-5II, 7, El-E6
 
 [16]
 
 ). Plaintiff recalls that the doctor spent approximately an hour with him.
 

 Defendant thereafter drove plaintiff in his cruiser to the State Police Barracks in West-brook, Connecticut.
 
 [17]
 
 He was charged with burglary in the third degree and interfering with a police officer, in violation of Conn.Gen. Stat. §§ 53a-103 and 53a-167a, respectively. Consistent with their procedure, photographs were taken of plaintiff and were attached to defendant’s investigative report. (Jt. Exh. 1; Exh. 1). In following State Police procedures with respect to the use of canines, defendant’s supervisor, Sergeant J.W. Sudol, reviewed defendant’s actions, and concluded that defendant’s usage of Denver was justified and that plaintiff’s unusual decree of injury was the result of his resisting apprehension. (Jt.Exh. 5).
 

 A $1000.00 bond was set at the State Police Barracks, which plaintiff was unable to make. Defendant concluded that plaintiff was still “extremely intoxicated” and very uncooperative Friday night, so that he did not advise him of his
 
 Miranda
 
 rights or attempt to take a statement from him. Instead, defendant waited until Sunday evening, August 19, 1990, when plaintiff was “alert, attentive, and cooperative”; plaintiff waived his
 
 Miranda
 
 rights. (Jt.Exh. 6). Plaintiff then gave defendant a sworn, written statement, in which he admitted that he had consumed several alcoholic beverages during the day, fled from the Chester constable, hidden in a garage while the police searched for him, and heard defendant order him to stop at the Abbott parking lot.
 
 [18]
 
 Plaintiff remained in a lightly blood stained hospital gown throughout the weekend.
 
 [19]
 
 He was released on a promise-to-appear in court Monday morning. Plaintiff was under the care of Middlesex Memorial Family Practice for these injuries, receiving antibiotics for infection; two of the stitches had to be resutured. (Exhs. 7-8). Plaintiff has small scars on his arms and legs and two large scars on his upper thigh, approximately eight to nine inches above his knee, from these injuries.
 
 [20]
 

 
 *140
 
 Plaintiffs expert on canines, John Henkel,
 
 [21]
 
 testified that he considered Denver and defendant’s actions to be “exemplary,” and that the use of a police dog was appropriate under these circumstances. In order to contain a suspect, a police dog is expected to give “deep bites,” using all his teeth back to the molars, which can exert as much as eight hundred pounds of pressure per square inch.
 
 [22]
 
 A “deep bite” is evidenced by puncture marks;
 
 [23]
 
 lacerations are indicative of bites which are not deep. Given plaintiffs weight of 140-50 pounds and Denver’s weight of 95-110 pounds, he does not believe that plaintiff would have had “much of a chance to struggle.” Henkel was troubled that plaintiff appeared to have a “great deal of damage” from two supposedly “brief struggles.” He would have expected to have seen only one to four deep bites from an encounter like this, instead of six deep bites and approximately ten superficial lacerations. Henkel estimated that based upon the extent of plaintiffs injuries, his struggle with Denver would have lasted for fifteen to twenty seconds, instead of the four to five-second engagement indicated in the police reports. Henkel concluded that the “damage appears excessive, given the time of the struggle.” Henkel also agreed that if plaintiff had been in a sitting position, it would have been “impossible” for him to have sustained injuries to his buttocks.
 

 In contrast, Master Sergeant David Barger,
 
 [24]
 
 defendant’s expert on canines, testified that defendant’s actions were consistent with his training and with Connecticut State Police canine policies. (Barger Tr. at 30-31). State Police canines are trained to apprehend a fleeing suspect by biting him on whatever body part is available.
 
 (Id.
 
 at 45-46). Master Sergeant Barger opined that plaintiff had received five to six bites; this number suggested that plaintiff had fled or resisted, in that there usually is “a very small number of bites in apprehensions.”
 
 (Id.
 
 at 31-32). He was of the opinion that the first bite was on plaintiffs right upper arm, with drag marks from the front to the back, suggesting that plaintiff was running away from the dog; these drag marks would not occur with a suspect who already was on the ground.
 
 (Id.
 
 at 49, 52-54, 57-58; Exh. E-6). Master Sergeant Barger believed that the “second engagement” was a laceration on plaintiffs thigh, right under the buttocks, which was consistent with plaintiff pulling away from Denver. (Barger Tr. at 54-55; Exh. I).
 
 [25]
 
 He further concluded that plaintiffs injuries were not consistent with his version of events, because bites to the upper thigh or buttocks would not occur to a person in a sitting position, but rather one who was fleeing. (Barger Tr. at 33-34, 58). Master Sergeant Barger also testified that when an intoxicated driver is pulled over to conduct a roadside sobriety test, it would not be appropriate to use a canine, because the dog would not be able to distinguish between the driver falling onto the police officer from his inebriation versus assaulting the officer.
 
 (Id.
 
 at 67-68).
 

 Dr. Edward Blanchette, defendant’s medical expert,
 
 [26]
 
 opined that plaintiffs injuries
 
 *141
 
 were “not serious in nature.” Of the sixteen different skin breaks, only one was more than two inches, one was slightly less than two inches, and the rest were less than one inch, and some were less than % inch in length. (See Exh. 7). He estimated that plaintiff had been bitten six to seven times, and that the superficial lacerations “strongly suggest resistance by plaintiff,” by his pulling away and getting up, resulting in injuries to all four extremities and the buttocks. If there had been no resistance, Dr. Blanchette concluded that there would have been at most one to two bites, which were “well-defined puncture wounds.” He agreed with Henkel that fifteen to twenty seconds was enough time to inflict these injuries, but even less than fifteen seconds was possible as well.
 
 [27]
 

 II. CONCLUSIONS OF LAW
 

 The following constitutes this Court’s conclusions of law, pursuant to Fed.R.Civ.P. 52(a):
 

 At trial, plaintiff’s counsel agreed that plaintiffs claims are based solely upon the Fourth Amendment, plaintiff having withdrawn his Eighth Amendment claims. The seminal United States Supreme Court decision on the use of force under the Fourth Amendment is, of course,
 
 Tennessee v. Garner,
 
 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which involved deadly force used to apprehend an unarmed suspect who was fleeing from a residential burglary at night. In holding the officer’s actions as unconstitutional, the Court developed the following test:
 

 To determine the constitutionality of a seizure “[w]e must balance the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.” We have described “the balancing of competing interests” as “the key principle of the Fourth Amendment.” Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.
 

 Id.
 
 at 8, 105 S.Ct. at 1699 (multiple citations omitted).
 

 The
 
 Gamer
 
 analysis was applied by the Sixth Circuit in
 
 Robinette v. Barnes,
 
 854 F.2d 909 (6th Cir.1988), with respect to the use of canines, resulting in a death. There, police entered an automobile dealership at night, in response to the activation of its burglar alarm; they immediately identified a broken glass door as the point of entry and saw the suspect inside, looking back at them. The defendant-police officer gave at least three warnings to the suspect that he was going to release his canine. When the police officer rejoined his dog in a darkened area of the car dealership, he discovered the canine and suspect under an automobile, and the dog was holding the suspect by his neck, which was bleeding profusely. The suspect died shortly thereafter. The Sixth Circuit held that the use of the canine was not unreasonable under the circumstances for two reasons. First, it concluded that the use of the canine was not “deadly force” in that the police officer did not intend for the suspect to die or suffer serious bodily harm: “Although we cannot ignore the fact that, in this case, the use of a police dog did result in a person’s death, we also cannot ignore the evidence in the record which indicates that this tragic event was an extreme aberration from the outcome intended or expected.”
 
 Id.
 
 at 912. Second, the appellate court concluded that even if the use of a police dog constituted deadly force, the “balancing” required by
 
 Gamer
 
 supported the use of the dog, because the suspect failed to respond to the officer’s warnings, so that “[ujnder the totality of the circumstances, [defendant] was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect.”
 
 Id.
 
 at 913-14. The Sixth Circuit continued:
 

 Indeed, instead of generally causing deadly force to be used to apprehend criminals, we believe that these dogs often can
 
 *142
 
 help prevent officers from having to resort to, or be subjected to, such force. Any attempt to apprehend a criminal suspect presents the officer with [a] difficult and frightening situation, but certainly an attempt to arrest a suspect hidden inside an unfamiliar budding during the nighttime presents a particularly confusing one. The use of dogs can make it more likely that the officers can apprehend suspects without the risks attendant to the use of firearms in the darkness, thus, frequently enhancing the safety of the officers, bystanders and the suspect.
 

 Accordingly, we are not persuaded by the evidence presented that the remote possibility that the use of a police dog to apprehend a felon might, under extraordinary circumstances, cause death, outweighs the dogs’ proven benefits for effective law enforcement.
 

 Id.
 
 at 914.
 

 The next year, the United States Supreme Court in
 
 Graham v. Connor,
 
 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), made “explicit what was implicit in Gamer’s analysis,” and held that
 
 “all
 
 claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other ‘seizure’ of a free citizen should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard....”
 
 Id.
 
 at 395, 109 S.Ct. at 1871 (emphasis in original). The Court developed the following legal standard to be applied:
 

 Because “[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,” ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.....
 

 The “reasonableness” of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. ... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.
 

 As in other Fourth Amendment contexts, ... the “reasonableness” inquiry in an excessive force case is an objective one: the question is whether the officers’ actions are “objectively reasonable” in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.
 

 Id.
 
 at 396-97, 109 S.Ct. at 1872 (multiple citations omitted).
 

 The facts here are remarkably similar to those in
 
 Matthews v. Jones,
 
 35 F.3d 1046 (6th Cir.1994), where a police officer stopped the plaintiff-driver for intoxication and speeding; the plaintiff, who had a suspended driver’s license, fled from his automobile into a wooded area. Within one minute, another police officer arrived with his canine. They yelled to the suspect to surrender; hearing no response, they permitted the dog to track the suspect. The dog gave indications that the suspect was in a “swampy, heavily wooded area”; the officers gave at least three warnings that if the suspect did not surrender, they would release the canine. Again hearing no response, they released the dog, who immediately found plaintiff. The canine handler advised plaintiff, who had been lying on his stomach in the weeds, to be still. Instead, plaintiff quickly rose to his knees, and the canine bit plaintiff on the arm. Plaintiff still continued to struggle, so that the dog repositioned his bite on plaintiff. Plaintiff then was arrested on a variety of charges. In relying upon
 
 Gamer, Robinette
 
 and
 
 Graham,
 
 the Sixth Circuit easily found that the police officers had acted in a constitutional manner:
 

 [Plaintiff] was obviously fleeing in an attempt to evade the police; the area into which he fled in the darkness provided a strategic advantage to [plaintiff] in that he could easily ambush the officers; and [plaintiff’s] extreme behavior provided cause for the officers to believe that he was involved in activity considerably more ne
 
 *143
 
 farious than mere traffic violations. We hold that a reasonable police officer under these circumstances would have believed that [plaintiff] posed a threat to the officers’ safety as well as the safety of others ____
 

 Id.
 
 at 1051.
 

 Plaintiff has fallen far short of his burden here for several reasons. First, his version of the facts is totally inconsistent with the injuries he sustained. Had he remained in a sitting position, compliant and polite, as he testified, he would not have received injuries to his buttocks and the back of his legs, with which both experts agreed. Second, by plaintiffs own admissions, his recollection of the incident was “kind of blurry, foggy.” His behavior was rather erratic, in that he continued to thrash about and scream even after Denver was no longer on him. In contrast, the testimony of the three State Troopers was largely consistent.
 

 Third, to the extent that plaintiff suffered these rather extensive injuries, they are the direct result of his resistance. While standing at the elevated end of the fence, the troopers observed plaintiff struggling with the dog. Defendant advised plaintiff that the canine would not attack if plaintiff remained still. Instead, plaintiff raised himself on all fours, as if he were going to escape, causing Denver to attempt to reattach himself. Plaintiff resisted the dog, by grabbing Denver’s jaw, striking him, and kicking him, which prevented Denver from achieving a “deep bite.” Henkel, plaintiffs expert, opined plaintiff must have struggled with Denver for fifteen to twenty seconds; Dr. Blanchette testified that these injuries could have been incurred in less than fifteen seconds. This time frame is not inconsistent with the troopers’ testimony, if at least two to three seconds elapsed in each of the following activities: (1) running from the cruiser to the fence; (2) watching the struggle between plaintiff and Denver; (3) running from the fence to the stairs; and (4) running down the stairs.
 

 Fourth, under the
 
 Graham
 
 analysis,, defendant acted in a constitutional fashion:
 

 Because ‘[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,’ ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
 

 The felonies with which plaintiff was charged are admittedly not “severe.” However, plaintiff did pose “an immediate threat to the safety of the officers or others” in that defendant did not know whether plaintiff was armed and plaintiff had been seen, by at least one witness, exiting from a neighbor’s garage. Lastly, there is no dispute that plaintiff was “actively resisting arrest or attempting to evade arrest by flight.”
 

 Fifth, defendant’s actions were consistent with the two dog bite cases discussed above. Henkel agreed that Denver and defendant’s actions were “exemplary” and that the use of a police dog was appropriate under these circumstances. As previously indicated, the facts in
 
 Matthews
 
 are virtually indistinguishable from those here.
 

 ■ And last, contrary to plaintiffs contentions, Master Sergeant Barger testified that it would be improper to utilize a police canine upon
 
 initially
 
 puffing over an intoxicated driver, because during the standard roadside sobriety test, the dog would not be able to distinguish between the drunken driver falling onto the police officer and the driver assaulting the officer. In sharp contrast, in this instance, plaintiff was resisting arrest, by fleeing from his wife’s car, running by wooded areas and residences, fleeing from a police car which he admitted seeing, and finally resisting a police canine.
 
 [28]
 

 III. CONCLUSION
 

 For the reasons stated above, judgment shall enter for defendant.
 

 [1]
 

 . Eight witnesses testified — defendant Mark Cassista, Julie Martin, and David Todd, all of whom are members of the Connecticut State Police and were jointly designated witnesses; Minda Loose-more, John Henkel, who served as an expert witness, and plaintiff David Carey, for plaintiff; and Dr. Edward Blanchette and Master Sergeant
 
 *137
 
 David Barger, both of whom served as expert witnesses for defendant. (Dkt. # 42).
 

 The parties submitted nine joint exhibits (Jt.Exhs. 1-9); plaintiff submitted forty-two exhibits (Exhs. 1, 2-4, 5, 5A-5II, 6-8); and defendant submitted sixteen exhibits (Exhs. A, B1-B5, C-D, E1-E6, F, I). (Dkt. ## 41, 43^14).
 

 Only the testimony of Master Sergeant Barger was transcribed ["Barger Tr."](Dkt. # 47). With respect to all other testimony, the Magistrate Judge has relied upon her detailed notes.
 

 [2]
 

 . Exhs. A, B1-B3 are photographs of this general area.
 

 [3]
 

 . Exh. B4 is a photograph of this neighbor’s house and multiple garages. By coincidence, plaintiff and Loosemore are very distantly related, and he and his girlfriend briefly had rented a room at her house; Loosemore testified that she did not recognize him that day because he had gained weight.
 

 [4]
 

 . Plaintiff testified that he had fallen asleep in a field. He denied having gone into anyone's garage.
 

 [5]
 

 . Trooper Martin turned in an easterly direction on Route 148, back towards Route 9.
 

 [6]
 

 . Jt. Exhs. 2 & 7 and Exh. B5 are photographs of the Abbott property and the adjacent street.
 

 [7]
 

 . Plaintiff testified that he did not hear defendant. Even if he did not hear defendant’s command, he should have stopped running, upon seeing the police cruiser. Trooper Martin testified that she heard defendant give at least three commands to plaintiff and also heard plaintiff's foul response.
 

 [8]
 

 . Jt. Exhs. 3-4 are photographs of this area.
 

 [9]
 

 . Plaintiff testified that he injured his ankle from this fall.
 

 [10]
 

 . Denver was assigned to defendant when he was a six- to eight-month-old puppy and was four years old at the time of this incident. Denver has since retired as a State Police dog, but continues to reside with defendant as his pet. (Barger Tr. at 22-24).
 

 Denver has impeccable credentials. (Jt.Exh. 8). Denver received thirteen weeks of training, during which he received high grades. (Exh. D; Barger Tr. at 24, 25). Defendant and Denver received the highest grades in their class. Denver has been honored on countless occasions for his performance. (Exh. C). Although Denver has apprehended other suspects, this is the only complaint ever made against him.
 
 (See also
 
 Barger Tr. at 28). Denver has never bitten a still person.
 

 [11]
 

 . Defendant estimated that it took them two to three seconds to reach the fence.
 

 [12]
 

 . Defendant estimated that he observed Denver on top of plaintiff for a "couple of seconds.”
 

 [13]
 

 . Defendant testified that it also took him a "couple of seconds” to reach the stairs.
 

 [14]
 

 . Defendant similarly estimated that it took a "couple of seconds” to reach the bottom of the stairs. Trooper Martin's estimation was similar,
 
 i.e.,
 
 that Denver was on plaintiff for only a "couple of seconds.”
 

 [15]
 

 . Plaintiff’s version was markedly different. Plaintiff claimed that he was sitting in the field as a result of his ankle injury, compliant to defendant’s instructions. Plaintiff testified that after defendant came down the stairs and was within seven feet of plaintiff, defendant folded his arms, smiled, and twice gave Denver the "get him” command. He testified that he asked defendant, "Would you please call your dog off?” He does not remember any further occurrences until being transported in the ambulance. He did concede that his recollection was “kind of blurry, foggy."
 

 [16]
 

 . Exhs. 5, 5A-5II, 7, E1-E6 were taken by plaintiff's wife on the following Monday, August 20, 1990.
 

 [17]
 

 . Plaintiff testified that Denver was in the back seat of the cruiser, barking at plaintiff. Plaintiff believes that defendant seemed to enjoy plaintiff's understandable concern.
 

 [18]
 

 . Plaintiff recognized his signature, but could not recall giving this statement, due to severe sleep deprivation.
 

 [19]
 

 . Plaintiff testified that he was the source of much amusement at the State Police Barracks that weekend, with as many as eight to nine troopers laughing at him with "smart comments.” He complained that he was in considerable pain from his injuries, and that his body was oozing with pus through his bandages.
 

 [20]
 

 . However, as Exhs. 5D, 5H, 5N, 5P, 5Q, 5U, 5EE, 5GG, E2 & E6 indicate, plaintiff has multiple tattoos in these regions as well. He testified that he was tattooed at an earlier time, of which he is not particularly proud now. Plaintiff also
 
 *140
 
 has a large preexisting scar on his leg from a previous automobile accident. (Exh. 5).
 

 [21]
 

 .
 
 See
 
 Exh. 4. He has supplemented the training of police dogs. Henkel once trained a German Shepard to attack the Energizer Bunny for the
 
 David Letterman Show.
 

 [22]
 

 . Henkel testified that people can pass out from the pain of a single bite. Master Sergeant Barger testified that the pressure can be as great as 1,200 pounds of pressure per square inch. (Barger Tr. at 41).
 

 [23]
 

 . Master Sergeant Barger testified that in a “deep bite,” he would expect to see four puncture marks, from the dog's canine teeth. (Barger Tr. at 43-44, 61).
 

 [24]
 

 .
 
 See
 
 Exh. I; Barger Tr. at 2-11. Master Sergeant Barger has been involved with training State Police Dogs since 1979 and now serves as Unit Administrator of the Canine Training Center. (Barger Tr. at 2-3, 35-36).
 

 He testified at great length regarding the extensive screening, training, and monitoring that Connecticut State Police canines and their handlers receive.
 
 (Id.
 
 at 11-22, 36-37).
 

 [25]
 

 . Master Sergeant Barger conceded that the leg injury could have occurred first, followed by the arm injury. (Barger Tr. at 56-57).
 

 [26]
 

 .
 
 See
 
 Exh. F. Dr. Blanchette has had considerable experience in treating and evaluating canine bites, particularly from police and correctional dogs. This was, however, the first time he testified in a dog bite case.
 

 [27]
 

 . Dr. Blanchette testified that in suturing canine bites, a doctor faces a dilemma, because if the sutures are too tight, it increases the risk of infection; on the other hand, the doctor wants a “good cosmetic result” for the patient. As a result, some surgeons chose to do nothing initially, followed by secondary repair if scars later develop.
 

 [28]
 

 . Given this conclusion, there is no need to address the issue of qualified immunity.