Matthew M. **MASON**, Plaintiff,

v.

**HAMILTON COUNTY, Marion County, Jack Cottey, Jerry Cooper, Scott Minier, David Durant, Jim Fetters, Benny Diggs, Joe Cook, Dan Nickel, Dick Russell, Eric Parker, and Sand Creek Partners, L.P., d/b/a Deer Creek Music Center, Defendants.**

No. IP 96–746–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 14, 1998.

Tim Philpot and John Roach, Philpot Ransdell Roach & Wier, Lexington, KY, for Plaintiff.

Daniel P. Byron, McHale, Cook & Welch, Indianapolis, IN, for Defendants Marion County, Jack Cottey, Jerry Cooper, Scott Minier, David Durant, and Eric Parker.

John F. Kautzman, Ruckelshaus Roland Hasbrook & O'Connor, Indianapolis, IN, for Defendants David Durant, Benny Diggs, and Eric Parker.

Michael A. Howard, Noblesville, IN, for Defendants Jim Fetters, Joe Cook, Dan Nickel, Dick Russell, and Hamilton County.

## ENTRY ON PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL

HAMILTON, District Judge.

This case presents the issue whether, as a matter of law, a police officer violated the Fourth Amendment's prohibition on excessive force by ordering a police dog to attack, bite, and hold a suspect. The suspect was apparently attempting to crash the gates of a concert. He was also fleeing from the officer's command to stop and his warning that the police dog would be released. The jury found at trial that the force was not excessive under the circumstances. As explained below, whether the force used was excessive was a question for the jury to decide, and the jury's verdict was not irrational. The court therefore denies plaintiff's motion for judgment as a matter of law on the issue of liability under the Fourth Amendment.

### Background

On July 19, 1994, plaintiff Matthew M. Mason attended a Grateful Dead concert at the Deer Creek Music Center in Hamilton County, near Noblesville, Indiana. After taking two and a half tabs of LSD, Mason felt ill and left the concert gates. Outside the concert venue, he had a violent encounter with a police dog and officers of the Marion County Sheriff's Department who were providing assistance to the Hamilton County Sheriff's Department for the concert. Mason suffered numerous puncture wounds and bruises from repeated dog bites. The dog bites were inflicted by Robo, a trained police dog under the control of defendant David Durant of the Marion County Sheriff's Department. Robo inflicted numerous bites because Mason fought off Robo and several police officers with extraordinary energy, so that Robo and the officers tried several times to subdue Mason before they finally succeeded.

Mason filed suit under federal and state law against Durant and other officers involved, Marion County, Hamilton County, and the operators of the concert venue. At the close of the evidence at trial, the court granted judgment as a matter of law for

some defendants on some claims. At the same time, plaintiff Mason moved for judgment as a matter of law on the issue whether defendant David Durant's initial command to the dog to apprehend Mason amounted to an unconstitutional use of force and battery against him. The court took that motion under advisement and submitted the case to the jury. The jury returned a verdict in favor of defendants and against Mason on all claims submitted to the jury. The court entered judgment consistent with that verdict.

Plaintiff Mason then filed a timely motion under Fed.R.Civ.P. 50(b) and 59(a). His motion seeks judgment as a matter of law as to liability on his Fourth Amendment claim against defendant Durant and his claim for battery against the two counties based on Durant's conduct. Mason's motion also seeks a new trial on those claims limited to the issues of damages and the reasonableness of Mason's resistance to the allegedly excessive force used by Durant.

### The Standard for Judgment as a Matter of Law

■ In considering a motion for judgment as a matter of law under Fed.R.Civ.P. 50, the court does not act as an extra juror. Where the plaintiff moves for judgment as a matter of law, the court must view the evidence in the light most favorable to the defendants and must give them the benefit of all reasonable inferences from the evidence. The court may grant judgment as a matter of law only if the jury could not rationally have found in favor of the opposing parties. See, e.g., Tuohey v. Chicago Park District, 148 F.3d 735, 739, (7th Cir.1998); Frazell v. Flanigan, 102 F.3d 877, 882 (7th Cir.1996) (affirming denial of judgment as a matter of law for defendant police officer in excessive force case); Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 629 (7th Cir.1996). The evidence easily could have supported a jury verdict in favor of plaintiff Mason on his Fourth Amendment claim against Durant and his battery claims against the counties based on Durant's command to the dog. Under the narrow standard that applies to motions for judgment as a matter of law, however, the

court finds that Mason is not entitled to judgment as a matter of law.

### Discussion

■ Under the Fourth Amendment, a police officer's decision to use force must be evaluated in light of the objective circumstances the officer faced at the time he made the decision. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Viewing the evidence in the light most favorable to defendants, the evidence showed the following with respect to Durant's initial decision to order Robo to attack plaintiff Mason. Officer Durant and Robo were helping to provide security at a Grateful Dead concert at the Deer Creek Music Center near Noblesville, Indiana. Grateful Dead concerts, including their prior concerts at Deer Creek, had posed serious concerns for law enforcement because of extensive drug use and unusually severe crowd control problems. Durant had worked Grateful Dead concerts twice before the 1994 concert. He was familiar with those problems and had personally observed and dealt with those problems. Durant was familiar with crowd tactics at Grateful Dead concerts such as using one person as a "sacrificial lamb" in an attempt to distract the attention of police officers and other security personnel by running toward the fence and trying to escape so as to cause numerous officers to chase the person, thereby allowing a large group of fans to storm a fence and literally crash the gates into the concert.

Plaintiff's expert witness on the use of force by police described the "force continuum" that most police officers are trained to use. The defense witnesses generally agreed with his description of the levels of force. The force continuum begins with the officer's physical presence, which obviously can influence behavior of people who see the officer, and proceeds to oral commands, usually given in a loud and imposing voice. The next step up the continuum is "soft hands"—the officer's use of a firm grip on a subject to control the subject's actions. The next step up the continuum would be the use of "control holds," hard grips in which the officer inflicts some pressure and pain on a subject

to control the subject's actions. Plaintiff's expert then identified several other types of force that he described as "intermediate"—the use of police batons (although not around the subject's head), stun guns, chemical irritants, and police dogs. These are all forms of force that will inflict pain on the subject. The next step up the continuum is the biggest step, to deadly force.

In 1994 defendant Durant had worked with Robo for several years. Robo is a Rottweiler and weighs about 95 pounds. Robo had been trained to assist police in tracking, area searches, and building searches, and had been trained to protect his handler. Robo also had been trained to apprehend subjects on command by biting and holding the subjects. Durant described Robo's bite training as "non-specific," meaning that Robo had not been taught to bite a person on a particular part of the body, but he had been specifically trained *not* to bite a person on the neck and head. As a result of his training, when Robo bites a person, the bite is to the arm, back, or leg.

The evening of the Grateful Dead concert, Durant and Robo had been assigned to patrol a grassy area that was outside the fence surrounding the concert itself, but inside a "snow fence" that was used to put the area off limits to the public. Durant was working near defendant Benny Diggs, but Diggs and his dog were on the other side of a chain-link fence about seven feet high that separated the concert venue from the outside area where Durant was working.

A little while after the concert began, Durant saw Mason running as he emerged from some brush around a creek that ran through the off-limits area marked by the snow fence. The evidence was in conflict on this point, but Mason was probably at least ten yards away from Durant at that moment. Durant shouted three fast warnings: "Stop, Sheriffs Department—Sheriff's Department, stop or I'll send the dog—Sheriff's Department, stop or I'll send the dog!" Mason appeared to hear the warnings and looked straight at Durant so that their eyes "locked." Mason then ran away at top speed toward the chain-link fence and the concert venue. At that point Durant reasonably concluded that Mason was trying to break into the concert without having a ticket and thus was committing criminal trespass and attempted theft. He was also fleeing a police officer's lawful order to stop. Durant did not see a crowd of people ready to follow Mason and take advantage of the distraction he might cause.

According to Durant's testimony, which the court must accept for purposes of this motion, he considered his options very quickly, concluded that he could not catch Mason himself, and decided that the use of Robo was the only use of force that was reasonably likely to succeed in capturing Mason. Other forms of non-deadly force (such as use of pepper spray) would have required Durant to be much closer to Mason, who was running away at top speed. The jury also heard testimony that, in this particular setting because of the crowd, it was not practical or prudent for Durant to leave Robo alone and to try to chase Mason on foot. The jury also could have reasonably concluded that Durant could not assume that defendant Diggs or perhaps other nearby security personnel would be in a better position to catch Mason. In other words, the jury could have reasonably found that Durant had to choose in a few seconds between ordering Robo to attack and letting Mason escape over the fence into the concert crowd. Durant testified that he felt it was his duty not to let Mason go, and he decided not to allow Mason to escape. At that point, Durant gave Robo a command to chase Mason and subdue him. Because Robo had been trained to "bite and hold," that command made at least one hard bite virtually inevitable. Robo chased after Mason, knocked him to the ground in a few seconds, and bit and held Mason. In the following seconds, Durant ordered Robo to release Mason. Robo obeyed, and Mason then fought with both Robo and Durant to get free. The ensuing struggles resulted in more injuries to Mason. According to the officers who took part in the effort to subdue him, Mason fought back with extraordinary force.

The focus of Mason's post-trial motion is Durant's initial command to Robo to apprehend him, before any of the later struggles. Mason argues that he posed no apparent threat to Durant or to any other person, and

that to the extent Durant thought he was trying to commit a crime, it was the not very serious crime of stealing the value of a concert ticket. Mason contends it was unreasonable to use the force of an attack by Robo to prevent that crime. He relies primarily on the principles of *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (use of deadly force to stop fleeing, unarmed burglary suspect violated Fourth Amendment where officer had no objective indication that suspect posed threat to safety of officer or others). Mason also contends that Durant had other reasonable courses available to him, including alerting defendant Diggs (who was on the other side of the chain-link fence Mason was running toward), as well as simply letting Mason go entirely. As the Supreme Court said in *Garner* in the context of deadly force: "It is not better that all felony suspects die than that they escape. *** It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect." 471 U.S. at 11, 105 S.Ct. 1694. Mason argues that the same reasoning applies to the use of the police dog here, and that it was unreasonable for Durant to use the force of a police dog against a person he thought was doing nothing worse than trying to crash the gates of a rock concert. Also, although Indiana treats theft of any amount as a felony, *Garner* makes clear that the dichotomy between felonies and misdemeanors does not control the Fourth Amendment analysis. *Id.* at 12–15, 105 S.Ct. 1694.

The use of a police dog is not inherently deadly force, but the use of a dog trained to "bite and hold" a subject is likely to result in at least some injuries to a subject even if the subject submits immediately after the first physical contact with the dog. See, *e.g.*, *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1550 (11th Cir.1989) (when police dogs are trained to bite and hold, injuries are "often inevitable"); cf. *Chew v. Gates*, 27 F.3d 1432, 1441–42 (9th Cir.1994) (Reinhardt, J.) (describing force of dog trained to "bite and hold" as "severe" but declining to decide whether it was "deadly"); *id.* at 1453–55 & n. 5 (Norris, J.) (whether use of police dog was use of deadly force was question of fact); *id.*

at 1471 (Trott, J.) ("trained dog is much less dangerous than a shotgun," and although a police dog can inflict fatal wounds, experience shows this is not common); *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir.1988) (affirming summary judgment for defense; holding that use of police dog was not deadly force although subject died as result of dog's attack; death was "an extreme aberration from the outcome intended or expected").

When a law enforcement officer is alleged to have used excessive force in the course of an arrest, the issue is whether the officer's actions were "objectively reasonable" in light of the situation the officer faced. *Graham v. Connor*, 490 U.S. at 397, 109 S.Ct. 1865; *Frazell v. Flanigan*, 102 F.3d at 882. Relevant factors in determining whether an officer's actions were objectively reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865; accord, *Frazell v. Flanigan*, 102 F.3d at 882–83. In light of *Tennessee v. Garner* and *Graham v. Connor*, the jury was instructed in relevant part:

> You must consider all of the circumstances of the defendant's position at the time the force was used. These circumstances include the nature and severity of the crime at issue, whether the suspect then posed an immediate threat to the defendant's safety, and whether the plaintiff was then actively resisting arrest or attempting to evade arrest by fleeing, or had instead surrendered. You may also take into account the fact that police officers are often forced to make split-second decisions. However, even split-second decisions must still be reasonable under the circumstances. In some situations it may be unreasonable to use force even if the suspect will escape. You must consider all the circumstances in evaluating that question.

> You must consider all of the circumstances of which a defendant was aware each time he used force. For example,

you must consider all of the circumstances of which Deputy Durant was aware each time he released Robo and all of the circumstances of which Deputy Parker was aware when he used the pepper spray.

The issue here is whether a reasonable jury could weigh these factors and conclude that Durant acted reasonably when he first decided to release Robo to apprehend Mason as he ran away from Durant and toward the chain-link fence and the concert.[1]

The Supreme Court explained in *Graham v. Connor* that the test of reasonableness "is not capable of precise definition or mechanical application," and its proper application "requires careful attention to the facts and circumstances of each particular case. 490 U.S. at 396, 109 S.Ct. 1865, citing *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Tennessee v. Garner*, 471 U.S. at 8–9, 105 S.Ct. 1694; accord, Chew v. Gates, 27 F.3d at 1440 (Reinhardt, J.) (reversing summary judgment for defendants on policy governing use of police dogs; "[b]ecause questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury"); *Kopf v. Wing*, 942 F.2d 265, 268–69 (4th Cir.1991) (reversing summary judgment for defendants when armed robbery suspect was attacked by dog and beaten by officers); *Marley v. City of Allentown*, 774 F.Supp. 343, 346 (E.D.Pa.1991) (denying defendant's motion for judgment as a matter of law because release of police dog to attack unarmed suspect who "possibly" had stopped fleeing "may be objectively unreasonable"), *aff'd mem.*, 961 F.2d 1567 (3d Cir.1992); *Soto v. City of Sacramento*, 567 F.Supp. 662, 674–75, 687 (E.D.Cal.1983) (denying cross-motions for summary judgment on use of police dog to make arrest; questions of reasonableness are generally factual questions for the jury).

The reasonableness of a particular use of force is not subject to any mechanical tests and must be determined in light of all the objective circumstances. Nevertheless, some questions may of course be decided as a matter of law. For example, all parties and the court agree that a use of deadly force would not have been appropriate here. The law is also clear that, in some situations, the police must allow a fleeing suspect to escape rather than use excessive force. *Tennessee v. Garner*, 471 U.S. at 11, 105 S.Ct. 1694; Durant and Yarnall trial testimony. Most reported cases addressing the use of police dogs involve their use to apprehend suspects who are fleeing or hiding, and where the use of police dogs is a considered decision that requires a special canine unit to be called to the scene. See, *e.g., Chew v. Gates*, 27 F.3d at 1443 (opinion of Reinhardt, J.); *Mendoza v. Block*, 27 F.3d 1357, 1358 (9th Cir.1994). Cases in which a suspect appears to be committing a crime right in front of an officer holding a dog on a leash appear to be rare, to say the least.[2]

In fact, the published court decisions upholding the use of police dogs to apprehend suspects by biting and holding them virtually all involved fleeing or hiding subjects who were suspected of violent crimes such as robbery, or at least more serious thefts than the one at issue here, and where there usually was at least some evidence of danger to police officers or others. See, *e.g., Quintanilla v. City of Downey*, 84 F.3d 353, 354 (9th Cir.1996) (affirming defense verdict where dog was used to locate and apprehend vehicle theft suspect who was hiding in the dark after throwing a bottle at police); *Matthews v. Jones*, 35 F.3d 1046, 1052 (6th Cir.1994) (affirming summary judgment for defense where dog first located suspect who had fled after traffic chase into dark woods, and dog then attacked when suspect moved despite police officer's order to remain still); *Mendoza v. Block*, 27 F.3d at 1361 (collecting cases and upholding use of dog to apprehend hiding suspect in armed bank robbery); *Robinette v. Barnes*, 854 F.2d at 913 (affirming summary judgment for defense where dog

---

1. For purposes of his present motion, plaintiff effectively concedes that if the initial use of force against him was lawful, the later applications of force (additional bites by Robo and blows by officers) would have been justified to overcome his own violent resistance to the arrest.

2. By way of explanation of this unusual behavior, recall that Mason was under the influence of two and a half tabs of LSD, which was more than he had ever taken before.

attacked burglary suspect hiding in the dark); *Carey v. Cassista*, 939 F.Supp. 136 (D.Conn.1996) (finding for defense where dog located and bit man stopped for drunk driving who then fled into woods). Other decisions have ruled against police officers who used police dogs to attack suspects in less compelling situations, but treated the constitutionality of the use of force as a question for the jury. See *Kerr v. City of West Palm Beach*, 875 F.2d at 1551–52, 1556–57 (describing incidents where use of dogs involved excessive force against suspects of minor and nonviolent crimes, and reinstating plaintiffs' verdict based on unconstitutional city policy of inadequate training on use of dogs); *Marley v. City of Allentown*, 774 F.Supp. at 346 (denying officer's motion for judgment as a matter of law because release of police dog to attack unarmed misdemeanor suspect who "possibly" had stopped fleeing "may be objectively unreasonable"). Plaintiff has not cited any cases doing what he asks the court to do here, which is find *as a matter of law* that a use of a police dog to attack a fleeing suspect amounted to excessive force.

Robo is a 95–pound Rottweiler trained to bite and hold on command, but trained not to bite a suspect's head or neck. Durant reasonably suspected Mason of trespass and attempted theft (the value of a ticket to the concert), and Mason was fleeing law enforcement after he ran away in response to Durant's first warnings. The jury heard conflicting testimony from expert witnesses familiar with professional standards for use of police dogs and the more general use of force by police. The defense expert testified that the use of force was appropriate here and that it would not have been appropriate for Durant simply to let Mason go when he ran away.[3]

For purposes of this case, it is useful to consider what steps would reasonably have been open to Durant if he had not had a police dog available. Durant reasonably suspected Mason of trespass and attempted theft of the value of a concert ticket. Durant did not have information indicating that Mason posed a physical threat to anyone. As Mason ran away in response to Durant's

lawful commands to stop, Durant reasonably believed Mason was also fleeing law enforcement. Those circumstances gave Durant reasonable grounds to arrest Mason. Durant and other officers would have been justified in using other forms of non-deadly force to apprehend the fleeing Mason. See, *e.g., Rice v. Burks*, 999 F.2d 1172, 1174 & n. 1 (7th Cir.1993) (police officers entitled to qualified immunity on claim that one struck in the back a handcuffed arrestee who was running away, causing him to fall and be injured); *Lester v. City of Chicago*, 830 F.2d 706, 712 (7th Cir.1987) ("The power to arrest necessarily carries with it the power to use force to make an arrest."). For example, one or more officers who were physically able to do so could have been acting reasonably if they had tackled Mason and forced him to the ground or pavement. The relatively bland phrasing of the preceding sentence encompasses a potentially violent physical encounter in which some bruising, bleeding, and injuries can easily occur, both for the subject and the officers. It is not unreasonable to expect that a subject apprehended in that manner would suffer some significant pain and bruising from police blows with fists or elbows, or from violent contact with pavement or other unforgiving surfaces.

When the officer uses a dog that has been trained to bite and hold to make the initial stop, some injury to the subject is very likely to occur. Common sense and experience tell us that there are some significant differences between a hard dog bite and a hard tackle or blow with a fist. One district court recently heard testimony that a police dog's bite inflicts pressure of 800 to 1200 pounds per square inch, and that people can pass out from the pain of a single bite. *Carey v. Cassista*, 939 F.Supp. at 140 & n. 22. Some courts have pointed out also that a person being attacked by a dog is likely to try to fight off the dog (as Mason did here), which tends to make more bites and injuries highly probable. See, *e.g., Kerr v. City of West Palm Beach*, 875 F.2d at 1550 (suspects usually react to bite by attempting to free themselves, but dogs trained to "bite and hold"

---

3. The defense expert was Donald Yarnall of the canine unit of the Los Angeles Police Department. Mr. Yarnall was a defendant in *Chew v. Gates*.

try again to reestablish hold on suspects, so "suspects often suffer serious injuries from multiple bites received during the course of an apprehension"); see also *Kopf v. Wing,* 942 F.2d at 268 ("We believe that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum.").

Those are aspects of the force used here that easily could have led the jury to conclude that Durant's decision to use Robo was unreasonable. Because the jury rendered a verdict for the defense, however, the issue is whether the use of a dog was so qualitatively different from officers' tackles and blows or similar applications of reasonable force as to make use of the dog unreasonable as a matter of law in this situation. The issue is not how this judge would have voted as a member of the jury or decided the case after a bench trial. The question is whether the jury could *rationally* find, after weighing all the relevant circumstances facing Durant, that his quick decision to send the dog to attack Mason was a reasonable one. That question cannot be answered by simple formula. One reason it is submitted to a jury is to allow the jury to apply its common sense in balancing the competing factors at work here—the extent of the force used, the seriousness of the offense, which was not great, the fact that Mason had been warned the dog would be used and was attempting to flee, and the fact that Durant had no information indicating that Mason posed a threat of physical danger to anyone else at the time. The jury was instructed on these factors and presumably weighed them. Neither this court's jury instructions nor the opinions of higher courts upon which they were based offered the jury more precise mathematical guidance about how those factors should be weighed. The jury also heard conflicting expert opinions (to which neither side objected) on the question of reasonableness.

Although the court views the question presented by plaintiff's motion as fairly close with respect to Durant's initial decision to have Robo attack, in the final analysis the court cannot say that the jury's decision was irrational. The court is not aware of any case holding that a police officer's use of a police dog was excessive and unreasonable force as a matter of law, at least when the suspect was hiding or fleeing. Cf. *Chew v. Gates,* 27 F.3d at 1440–43 (opinion of Reinhardt, J.) (holding that reasonableness of use of dog could not be decided as a matter of law in light of *Graham v. Connor* factors).[4] Reasonable people could differ here in the weight they attribute to the relatively minor crimes at issue (when Durant made the initial decision to release Robo) and to the severity of the force Durant decided to use to apprehend Mason as he attempted to flee. The main advantage that Robo gave Durant and the other officers was speed—the speed to catch up with a fleeing suspect who had a head start on Durant and was running at top speed. Durant knew that Robo was well-trained and he could reasonably expect that any bites would be to Mason's legs, arms, or back, which in fact turned out to be the case. Durant could also reasonably expect that Robo would obey his shouted commands to stop the attack, which also turned out to be the case. Without attempting to minimize the pain inflicted by Robo's first bite, the court cannot overlook the fact that Durant reasonably concluded that Mason was committing crimes in his presence and was fleeing a lawful order to stop. Durant was entitled to use some degree of force to effect an arrest. His use of Robo involved a level

---

4. The court does not mean to imply that such issues could never be decided as a matter of law against a police officer. For example, ordering a dog to attack a suspect who has surrendered, has been handcuffed, and is not resisting police authority would surely be unreasonable as a matter of law, if those facts could be established. See *Mendoza v. Block,* 27 F.3d at 1362 ("no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."); *Luce v. Hayden,* 598 F.Supp. 1101, 1104 (D.Me.1984) (alleged order to dog to attack subject who had surrendered and was in full control of police would, if proven, "shock the conscience" and violate Constitution). Similarly, it might well be unreasonable as a matter of law to order a dog to attack a person who appears to be guilty of nothing worse than loitering, for example. See, *e.g., Kerr v. City of West Palm Beach,* 875 F.2d at 1551–52 (describing police dog attacks that led to jury verdicts against officers).

of force greater than those that plainly would have been constitutional under the circumstances, which could have included painful tackles and blows. A reasonable jury could have concluded that Durant's use of Robo was not reasonable under the circumstances. Nevertheless, the court is not persuaded that the command to Robo to bite and hold Mason's leg was so qualitatively different from plainly lawful forms of force as to render the jury's decision irrational.[5]

*Conclusion*

A police force that uses dogs trained to "bite and hold" can expect to need to defend its use of a dog before a jury from time to time. It can also expect to lose some of those cases, though not all of them. Under the controlling principles of Fourth Amendment law, the jury was responsible for weighing the force used, the seriousness of the crimes in issue, the presence or absence of threats to safety, and Mason's flight from Deputy Durant in evaluating the reasonableness of the use of Robo to apprehend Mason. The jury was properly instructed and did its job. Viewing the evidence in the light most favorable to defendants, the court cannot conclude that the jury's verdict for the defense was irrational. Accordingly, plaintiff Mason's motion for judgment as a matter of law on the issue of whether defendant Durant's initial command to Robo violated the Fourth Amendment and amounted to battery under Indiana law is hereby DENIED. Mason's accompanying request for a new trial

depends on the resolution of the Rule 50 motion and is also DENIED.

So ordered.

---

5. Police officers are entitled to qualified immunity so long as their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Frazell v. Flanigan,* 102 F.3d at 886. In deciding qualified immunity, the court focuses on the objective reasonableness of the defendants' actions, which makes the inquiry very similar to the merits inquiry directly under the Fourth Amendment as to whether the force used by defendant Durant was objectively reasonable under the circumstances he faced. Some circuits have determined that a finding on the merits of an excessive force claim effectively resolves the question of qualified immunity. See *Frazell,* 102 F.3d at 886–87, citing *Acosta v. City and County of San Francisco,* 83 F.3d 1143, 1147 (9th Cir.1996); *Rowland v. Perry,* 41 F.3d 167, 173–74 (4th Cir. 1994); *Wardlaw v. Pickett,* 1 F.3d 1297, 1303

(D.C.Cir.1993); *Posr v. Doherty,* 944 F.2d 91, 95–96 (2d Cir.1991); *Street v. Parham,* 929 F.2d 537, 540–41 (10th Cir.1991); *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir.1989). Although the Seventh Circuit has held open at least a theoretical possibility that a police officer could use unreasonable force but still be entitled to qualified immunity based on the unsettled state of the law, the court has made it clear that such cases are likely to be rare. See *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 467–77 (7th Cir.1997), discussing *Frazell,* 102 F.3d at 886–87, but cf. *Humphrey v. Staszak,* 148 F.3d 719, 725–26 (7th Cir.1998) (limiting *Frazell* and holding that officer was entitled to qualified immunity on false arrest claim despite jury verdict for plaintiff on merits of claim). The court therefore has not treated qualified immunity as a basis for denying plaintiff's motion for judgment as a matter of law.