63 F.3d 638
 150 L.R.R.M. (BNA) 2075
 BROTHERHOOD OF RAILROAD SIGNALMEN, et al., Petitioners,
and
State of Vermont, et al., Intervening Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
New England Central Railroad, Incorporated, et al.,
Intervening Respondents.
 No. 94-3877.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 31, 1995.
Decided Aug. 21, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Sept.
22, 1995.*
 
 William G. Mahoney, Richard S. Edelman (argued), Donald F. Griffin, Highsaw, Mahoney & Clarke, Washington, DC, for Broth. of R.R. Signalmen, American Train Dispatchers Ass'n, Broth. of Maintenance of Way Employees, Intern. Broth. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, Intern. Broth. of Elec. Workers, Intern. Broth. of Firemen & Oilers.
 Henri F. Rush, Louis Mackall (argued), John J. McCarthy, I.C.C., Office of the Gen. Counsel, Washington, DC, Janet Reno, U.S. Atty. Gen., Washington, DC, Dennis J. Stark, I.C.C., Compliance & Consumer Assistance, Chicago, IL, James B. Burns, Office of the U.S. Atty. Gen., Chicago, IL, for I.C.C.
 Janet Reno, U.S. Atty. Gen., Washington, DC, John J. Powers, III, Robert J. Wiggers, Dept. of Justice Antitrust Div., Appellate Section, Washington, DC, James B. Burns, Office of the U.S. Atty. Gen., Chicago, IL, for U.S.
 
 
 1
 Kelvin J. Dowd (argued), Patricia E. Dietrich, Slover & Loftus, Washington, DC, for New England Cent. R.R. Inc.
 
 
 2
 Robert P. Vom Eigen, Charles A. Spitulnik, Alicia M. Serfaty, Hopkins & Sutter, Washington, DC, for Central Vermont Ry. Inc.
 
 
 3
 John K. Dunleavy, Montpelier, VT, for State of VT.
 
 
 4
 Kenneth P. Kolson, Washington, DC, for The Ass'n of American Railroads.
 
 
 5
 Joseph Guerrieri, Jr., Martha Walfoort (argued) Guerrieri, Edmond & James, Washington, DC, Allison Beck, Mark D. Schneider, Intern. Ass'n of Machinist and Aerospace Workers, Upper Marlbro, MD, for Intern. Ass'n of Machinists & Aerospace Workers.
 
 
 6
 Joseph Guerrieri, Jr., Martha Walfoort, Guerrieri, Edmond & James, Washington, DC, Larry R. Pruden, Mitchell M. Krause, Transp. Communications Intern. Union, Rockville, MD, for Transp. Communications Intern. Union (TCU).
 
 
 7
 Joseph Guerrieri, Jr., Martha Walfoort, Guerrieri, Edmond & James, Washington, DC, Clinton J. Miller, III, Daniel R. Elliott, III, United Transp. Union, Cleveland, OH, for United Transp. Union.
 
 
 8
 Before POSNER, Chief Judge, RIPPLE, Circuit Judge, and NORGLE, District Judge.**
 
 
 9
 POSNER, Chief Judge.
 
 
 10
 This petition to review the decision by the Interstate Commerce Commission in New England Central R.R., Inc., Finance Dkt. No. 32432, Dec. 9, 1994, requires us to revisit an esoteric body of regulatory law that was before us last year in Fox Valley & Western Ltd. v. ICC, 15 F.3d 641 (7th Cir.1994). As we explained in that opinion, there are two possible statutes under which the Commission can approve the acquisition of a railroad. One is 49 U.S.C. Sec. 10901(a)(3), which applies to the acquisition of "an extended or additional railroad line" by either a "rail carrier" or--the Commission has held, and the parties do not question--a firm that will become a rail carrier by the very act of acquiring the railroad line that it is seeking approval to acquire. The second statute is 49 U.S.C. Sec. 11343, which applies to a number of transactions, mainly involving either the consolidation of carriers or the acquisition of more than one carrier (and such an acquisition carries with it a potential for consolidation), including the "acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers." 49 U.S.C. Sec. 11343(a)(5).
 
 
 11
 It is not always clear whether a given transaction should be classified under section 10901 or under section 11343. The importance of getting the classification right is that the rights of workers who are made superfluous by the transaction differ greatly under the two sections. If the transaction is classified under section 11343, the workers are statutorily entitled to what are called "New York Dock" conditions, entitling them to up to six years of severance pay. Fox Valley & Western Ltd. v. ICC, supra, 15 F.3d at 644; Missouri Pacific R.R.--Merger, 360 I.C.C. 565 (1979). Those conditions, though developed by the ICC, have been deemed the minimum required by the statute and have thus been placed beyond the Commission's power to revise once a transaction is classified under section 11343. New York Dock Ry. v. United States, 609 F.2d 83, 92-93, 101 (2d Cir.1979); Railway Labor Executives' Ass'n v. ICC, 930 F.2d 511, 514-15 (6th Cir.1991). If, however, the transaction is classified under section 10901, the Commission has the power to decide whether they get anything at all. Fox Valley & Western Ltd. v. ICC, supra, 15 F.3d at 644.
 
 
 12
 Now that it is clear what the stakes are in the classification of the transaction in this case, we describe the transaction. RailTex, Inc. is a holding company that owns a number of small railroads (each a corporate subsidiary of the holding company) scattered throughout the United States. It created a wholly owned subsidiary, New England Central Railroad, Inc., to buy the principal rail assets of Central Vermont Railway, Inc.--a small railroad operating in New England--from Central Vermont's owner, the Canadian National Railway Company. None of RailTex's other railroad subsidiaries connects with the lines of Central Vermont, so no consolidation of Central Vermont's lines with those of any other railroads owned by RailTex was contemplated. What was contemplated was the laying off of almost half of Central Vermont's work force, though with no curtailment of service to the railroad's customers. The plan was for RailTex's new subsidiary, New England Central Railroad, to step into Central Vermont's shoes and operate Central Vermont's tiny system (only 325 miles of lines) with a streamlined workforce consisting of 95 of Central Vermont's former 173 workers. It is easy to see what difference it might make to the surplus workers and to New England Central Railroad if those workers are entitled to the full New York Dock conditions. The imposition of the conditions might well be a deal-buster--which might suit the workers fine unless Central Vermont decided simply to abandon its rail operations.
 
 
 13
 The Commission held that the creation of New England Central Railroad by RailTex was the acquisition of control of a carrier (for that was what New England Central Railroad was created to be) by a holding company of carriers, and hence was governed by 49 U.S.C. Sec. 11343(a)(5). But this holding had no significance so far as worker-protective conditions were concerned because the transaction had no effect on workers--the new subsidiary had as yet no employees. As to the critical second step, the acquisition of the bulk of Central Vermont's rail assets by the new subsidiary, the Commission held that this acquisition was governed by section 10901, not 11343(a)(5) (or any other subsection of 11343), and hence that imposition of the New York Dock conditions was not mandatory. New England Central Railroad had offered the surplused workers some severance pay, and in approving the acquisition the Commission wrote these (modest) worker-protective conditions into its order, under the discretionary authority to which we alluded earlier and which the Commission finds in 49 U.S.C. Sec. 10901(e).
 
 
 14
 The unions representing the workers adversely affected by the Commission's refusal to impose the New York Dock conditions ask us to set aside its order on two alternative grounds. The first is that in substance the transaction was the acquisition of control of a rail carrier by a rail holding company and so is governed by section 11343(a)(5). The second is that, if section 10901 does apply instead, section 10901(e) confines the Commission to choosing between no worker-protective conditions and the New York Dock conditions; intermediate protections, such as imposed here, are forbidden. We address the second argument first. Section 10901(e), added by the Staggers Act in 1980 (the rest of the section dates back to 1920), provides that "the Commission may require any rail carrier proposing both to construct and operate a new railroad line pursuant to this section to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title." Section 11347 is the provision that requires the imposition of the New York Dock conditions on transactions approved pursuant to section 11343. So, read literally, section 10901(e) does say, as the unions argue, that the Commission may either impose no conditions for the protection of workers or the New York Dock conditions; there is no in-between. Clearly, they are not a minimum under section 10901(e); the minimum is zero; the question is whether the statute confines the Commission to that choice. No reason for such inflexibility appears, and the wording may be inadvertent--the legislative history of the Staggers Act being a blank on the question. (The original House bill made imposition of the New York Dock conditions mandatory, but without explanation; this was changed in conference to the present wording--again without discussion. H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 115 (1980).) And, in any event, section 10901(e) does not apply to this case, because the case does not involve construction. (The explicit limitation of the section to construction was noted by the chairman of the relevant House committee. 126 Cong.Rec. 24682 (1980) (remarks of Rep. Florio).) The applicable statute is 10901(c), which confers on the Commission comprehensive power to impose conditions on transactions approved under 10901, a power traditionally interpreted to include the imposition of conditions for the protection of workers harmed by the transaction. And there is no either-or wording in subsection (c).
 
 
 15
 It is true that the Commission's decision does not refer to 10901(c), but only to 10901(e). We take this to be error. Because (e) refers expressly to conditions for the protection of workers and (c) does not, it is natural on a hasty reading to assume that it is (e) that authorizes the Commission to impose conditions in all transactions governed by section 10901. Natural, but wrong. (We made the same error in Fox Valley & Western Ltd. v. ICC, supra, 15 F.3d at 644--probably because in that case too the Commission had relied on (e).) The scope of (e) cannot be co-extensive with the entire statute, because it is limited to construction, whereas (a), which lists the transactions to which the entire section applies, includes other transactions, such as the acquisition of a line of railroad. With respect to these other transactions, the only source of a power to protect workers is (c), which is not in terms limited to the New York Dock conditions--which puts no limitations on the conditions that the Commission may impose, let alone the either-or condition in (e). If (e) is taken to be the exclusive source of the power to impose labor conditions on section 10901 transactions, then the 1980 amendment that added that subsection to the statute created an absurd patchwork, in which with respect to construction the Commission may either do nothing for workers or impose the New York Dock conditions but may not do anything in between and with respect to all other transactions is forbidden to do anything at all for labor. There is no evidence that such a patchwork was intended. The Commission's preexisting worker-protection powers, possibly excepting construction, were not affected by the 1980 amendment.
 
 
 16
 The Commission should have said this, rather than treat (e) as simply a restatement of its traditional powers under (c). If we thought the Commission had meant to give (e) this twisted meaning--reading the words "to construct" out of the subsection--we would have to insist that the Commission explain itself. But as it seems more likely that the Commission simply made a careless mistake in citing (e) rather than (c), and as there is no doubt that the Commission has the power under (c) to invoke the conditions it imposed, and as there is also no doubt that it intended to impose those conditions, we cannot imagine what use would be served by remanding the case to the Commission. Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 757 n. 7, 106 S.Ct. 2169, 2176 n. 7, 90 L.Ed.2d 779 (1986); Illinois v. ICC, 722 F.2d 1341, 1348-49 (7th Cir.1983); see also Sahara Coal Co. v. Office of Workers' Compensation Programs, 946 F.2d 554, 558 (7th Cir.1991); Newell v. Director, 933 F.2d 510, 512 (7th Cir.1991); Ghaly v. INS, 48 F.3d 1426, 1438 (7th Cir.1995) (concurring opinion).
 
 
 17
 All this is on the assumption that the acquisition of Central Vermont's rail lines by New England Central Railroad was a section 10901 transaction, and not, as the unions vigorously contend, a section 11343(a)(5) transaction. That section covers the acquisition of control of a rail carrier by a noncarrier owner of rail carriers, such as RailTex. RailTex acquired control over (by the act of creating as a wholly owned subsidiary) New England Central Railroad. New England Central Railroad acquired control of a carrier, Central Vermont, by buying essentially all of its rail assets and stepping into its shoes as a carrier. Therefore RailTex acquired control over Central Vermont--a transaction within the scope of section 11343(a)(5).
 
 
 18
 This is a plausible characterization of the transaction, and if the Commission had adopted it we probably would accept it. The Commission has sufficient interpretive latitude to penetrate form to substance where that is necessary to prevent a railroad from defeating regulation by the facile expedient of doing in two steps what could as easily have been done in one. Cf. Yosha v. Commissioner, 861 F.2d 494 (7th Cir.1988). So we held in Fox Valley, following United States v. Marshall Transport Co., 322 U.S. 31, 39, 64 S.Ct. 899, 903, 88 L.Ed. 1110 (1944). But, by the same token, the Commission is, we believe, authorized to stop at form when there is a reasonable basis for doing so. Marshall Transport and Fox Valley upheld efforts by the ICC to plug loopholes by interpreting its statutes expansively. In both cases loopholes had emerged because carriers were using two-step or multiple-step transactions to bring about a consolidation of operations, which is the core transaction at which section 11343 is aimed. There is no prospect in this case of consolidation, because of the lack of contiguity between Central Vermont's rail lines and those of any other subsidiaries of RailTex. Hence there is no need to interpret the statute expansively in order to prevent the circumvention of its central policy. Flexible statutory interpretation designed to prevent the thwarting of the statute's policy does not entail flexible interpretation everywhere.
 
 
 19
 Nor would strict interpretation carry the day for the unions. Strict interpretation would do them in as surely as flexible interpretation would. For, strictly speaking, RailTex did not acquire control over Central Vermont, not only because it did not transact with Central Vermont but also because the acquisition by New England Central Railroad was not of Central Vermont--the carrier--as such but only of Central Vermont's rail lines. It is not even certain that the form of the transaction--acquiring physical assets rather than the intangible of control--was intended to defeat jurisdiction under section 11343. An alternative possibility is that it was intended to shield RailTex's shareholders and other subsidiaries from liability in tort or contract arising out of the operation of the newly acquired lines. There is no argument that New England Central Railroad is undercapitalized or otherwise vulnerable to a piercing of the corporate veil; and RailTex has not guaranteed its debts; so the effort to limit liability has probably succeeded, and in any event cannot be dismissed as spurious. As we suggested earlier, we suppose that the Commission could nevertheless, if it wanted, pierce the veil for the Commission's own purposes, treating the acquisition of Central Vermont's rail lines by New England Central Railroad as the acquisition of "control" over a "carrier" by RailTex. But this would not be an exercise in strict construction; it would be loophole-plugging free interpretation. As we also mentioned, the parties have not questioned the loose interpretation by which the Commission has stretched section 10901 to cover the case in which the acquiring entity becomes a carrier only by virtue of the acquisition. If proper, that loose interpretation, which gets the transaction out from under the mandatory imposition of the New York Dock condition, is emphatic evidence that it is not Congress's policy, expressed in the Interstate Commerce Act, that all transactions involving the acquisition of rail lines should be burdened with the New York Dock conditions. The existence of section 10901 makes clear that there is no such general policy. The conditions are required only if the transaction is of a certain kind, and the Commission was not required to find that the transaction in this case was of that kind.
 
 
 20
 AFFIRMED.
 
 
 
 *
 Diane P. Wood, Circuit Judge, did not participate in the vote for rehearing en banc
 
 
 **
 Hon. Charles R. Norgle, Sr., of the Northern District of Illinois