may err, but reconstructions are bound to do worse.

AFFIRMED.

Paul H. FRAZELL, Plaintiff–Appellee,

v.

E.K. FLANIGAN, Defendant–Appellant.

No. 94–3517.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1996.

Decided Dec. 10, 1996.

Susan O'Neal Johnson, Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, James P. Kellstedt, argued, Peoria Heights, IL, John P. Edmonds (argued), Chillicothe, IL, for Plaintiff–Appellee.

James E. Ryan, Office of the Attorney General, Chicago, IL, David Bo Mattson, Nuviah Shirazi, Deborah L. Barnes, Office of the Attorney General, Springfield, IL, Mary E. Welsh (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant–Appellant.

Before EASTERBROOK, ROVNER and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Paul H. Frazell brought this action under 42 U.S.C. § 1983, alleging that Illinois State Trooper E.K. Flanigan violated his Fourth Amendment rights in the course of a traffic stop and arrest on June 4, 1986. Frazell maintained that Flanigan used excessive force during the arrest and also failed to prevent other officers on the scene from using similar force against him. Frazell's claims were tried to a jury, which found in his favor and awarded $155,600 in compensatory damages and $3,900 in punitive damages. The district court entered judgment on the jury's verdicts and later denied Flani-

gan's motion for judgment as a matter of law or for a new trial. Flanigan now appeals, arguing that the jury's verdicts are not supported by the trial evidence and, alternatively, that he is entitled to qualified immunity. Having carefully reviewed the evidence before the jury below, we find it adequate to support the verdicts. We also conclude that in the circumstances of this case, Flanigan has no immunity from the jury's damage awards. We therefore affirm the judgment entered on the jury's verdicts.[1]

## I.

The jury heard varying accounts of what occurred during the June 4, 1986 traffic stop. Frazell testified that he suffered an epileptic seizure midway through the stop and that he remembers little of what occurred thereafter. Two co-workers were with Frazell at the time, and each related to the jury what he saw. The various law enforcement officers on the scene for all or a portion of the encounter also described their versions. In determining whether the evidence is sufficient to support the jury's verdicts, we construe the evidence in the light most favorable to Fr. ell, resolving any conflicts in his favor and according him the benefit of all reasonable inferences. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir.1993).

Frazell and his two companions told the following story. At approximately 9:00 p.m. on June 4, 1986, Frazell was on his way home from a construction job when his van was stopped by Trooper Flanigan. Ron Cooper and Vernon Henderson, who worked for Frazell, were with him at the time. The trooper explained that the trailer Frazell was pulling had no taillights and that he stopped the van for this reason. Frazell insisted that the trailer's taillights were operational, and he walked to the rear of the trailer with Flanigan to prove it. At that point, Flanigan

indicated that Frazell's van also had been swerving when it passed his squad car, and that he feared Frazell may be under the influence of alcohol. Frazell had consumed four or five beers while playing pool at a local tavern before heading home, and Flanigan also smelled the alcohol on his breath. Frazell explained to the trooper that the trailer may have swerved because it had been loaded incorrectly. He also told Flanigan that he has a detached retina in his right eye that affects his vision and thus his driving. Flanigan did not accept these excuses and proceeded to conduct a series of sobriety tests. He first directed his flashlight into Frazell's eyes to check for dilated pupils. The brightness of the light bothered Frazell's damaged eye and gave him a headache. Flanigan then required Frazell to walk the white line at the road's edge. When he had difficulty keeping his balance, Frazell volunteered that the oncoming traffic appeared too close and that it bothered his eye. Unimpressed, Flanigan told Frazell that he had failed the sobriety tests and that he was under arrest. Following standard procedures, the trooper then frisked Frazell, cuffed his hands behind his back, and placed him in the passenger seat of the squad car. Witnessing these events from the backseat of the van, Henderson described them to Cooper, who could not see from the front passenger seat. With Frazell already handcuffed in the squad car, Cooper approached Flanigan and requested permission to move the van and trailer off the shoulder of the road to a nearby driveway. Flanigan directed Cooper to get back into the van.

Seating himself next to Frazell, Flanigan first radioed for a tow truck to haul away the van. Frazell recalls that Flanigan then began to read aloud from a consent form, but by this point, Frazell was beginning to feel dizzy. The next thing he remembers, Frazell

1. Frazell initially questions our jurisdiction to consider Flanigan's appeal, arguing at some length that the appeal was not timely filed. On December 28, 1994, however, a motions panel considered the identical jurisdictional arguments in denying Frazell's motion to dismiss the appeal. That panel concluded that the district court rendered Flanigan's notice of appeal timely by granting Flanigan's motion to extend the time for filing the notice. *See* Fed.R.App.P. 4(a)(5).

The motions panel subsequently rejected Frazell's request for reconsideration of that decision. Although this panel is free to reconsider the motions panel's conclusion (*see, e.g., United States v. Alcantar*, 83 F.3d 185, 191 (7th Cir. 1996); *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 279–80 (7th Cir.1996)), Frazell has provided us with no persuasive reason for doing so.

was on the ground with two or three officers over him. One officer had his knee in the side of Frazell's head, a second officer was sitting on his back, and a third was at his feet. Frazell's hands were cuffed behind his back. From his vantage point in the van, Henderson saw Frazell on the ground with the three officers restraining him. According to Henderson, it was Flanigan who had a knee in Frazell's back, while a second state trooper was at Frazell's feet, and a local police officer at his head. Henderson saw Flanigan pull out a club or nightstick and strike Frazell with it twice in the back. Henderson relayed this information to Cooper, and both men then left the van and walked to the rear of the trailer. From there, Cooper could see Frazell on the ground with an officer at his head, a second officer on his back, and a third officer at his feet. Cooper saw that Frazell's hands were cuffed behind his back, that his legs were strapped together, and that blood was dripping down his face. Seeing Cooper, Frazell pleaded, "Get them off me, Ron. Get them off me." Cooper approached one of the officers and informed him that Frazell has a medical condition, that he "has seizures." The officer told Cooper to get back into the van or he would be next. Cooper and Henderson then returned to the van.

Henderson continued to observe the scene from the van's rear window and to relay his observations to Cooper in the front seat. After approximately ten or fifteen minutes, Cooper left the van for a third time and reached the rear of the van before an officer instructed him to get back inside. Before returning to the van, however, Cooper told the officers: "You don't need to be hitting him like that. You guys are going to kill him."

As time passed, additional officers arrived on the scene. Henderson counted six squad cars in all. He eventually saw certain of the officers pick Frazell up by the arms and drag him back to the last squad car in the line. Frazell's hands remained cuffed behind his back, and it appeared to Henderson that his feet also were restrained. As the officers dragged Frazell, Henderson observed one of them strike him twice in the back with a club

or nightstick. Frazell apparently regained some sense of awareness at this time, as he recalls being struck twice in the lower back while being dragged. The officers put him in the backseat of the last squad car, and Frazell recalls that he initially was kneeling on the floor with his chest and head slumped over the seat. One of the officers was striking Frazell's hands, apparently because he had grasped either the officer's shirt or the cage between the back and front seats of the squad car. Frazell remembers attempting to release his grip, but his hands would not obey. He finally remembers being kicked in the lower back. At about the same time that Frazell was being placed in the backseat of the squad car, a tow truck arrived to haul away the van. Cooper and Henderson left the scene with the tow truck and saw nothing further.

Being closer to these events than Cooper or Henderson, and without the impairment suffered by Frazell, the various law enforcement officers provided a more detailed version of the encounter, but one that conflicted in important respects with Frazell's evidence. Flanigan testified that after arresting Frazell, he twice read him the consent form. After the second reading, Frazell indicated that he was not feeling well and that he needed some air. By this time, Officer Jerry Washburn of the local police department had arrived on the scene and was standing by in the event Flanigan needed assistance. Flanigan directed Washburn to take Frazell out of the squad car before he became sick. The two officers then led Frazell to the rear of the car and leaned him against the trunk. Unsteady on his feet, Frazell eventually fell onto the trunk and rolled off the back fender, breaking the vehicle's rear antenna. Frazell ended up on the ground on his back and began scooting himself under the squad car with his feet. Flanigan testified that he reached down to stop Frazell but was kicked in the groin, which sent him sprawling backward into a ditch running parallel to the road. Washburn then grabbed Frazell by the ankles, pulled him out from under the squad car, and positioned his 300–pound frame on the small of Frazell's back while radioing for assistance. Washburn testified that before any additional officers arrived,

Frazell grabbed his gun with one of his cuffed hands and would not release it. When Washburn finally was able to free the gun, Frazell grabbed Washburn's shirt, tearing it to the armpit. Flanigan indicated that during this time, Frazell was cursing the officers and struggling and kicking with his feet.

State Trooper Harold Spence III then arrived on the scene and assisted Flanigan and Washburn in restraining the struggling Frazell. Spence described the scene as a "melee" and a "wrestling match" that went on for some time. The three officers eventually succeeded in applying flexible cuffs to Frazell's ankles. Shortly thereafter, the officers decided to transport Frazell in a squad car that was equipped with a cage between the front and back seats. By that time, two more officers had arrived, and four of the officers proceeded to carry Frazell to that vehicle, with Flanigan holding Frazell's cuffed feet. At some point in the journey, Frazell apparently grabbed the pant leg of one officer but released it when the officer struck his knuckles with a flashlight. As the officers were attempting to place Frazell in the backseat of the squad car, he kicked Flanigan in the chin, knocking the trooper backward and breaking his glasses. Angered, Flanigan moved toward Frazell, forcing Trooper Spence to intervene. The other officers, meanwhile, were still struggling to get Frazell into the squad car. Officer Chris Cates of the local police department testified that Frazell kicked him in the knee as he tried to force Frazell's legs into the car. Cates retaliated by striking Frazell twice with his fist either in the face or on the side of his head. Once inside the squad car, Frazell began to violently kick at the car's roof and back door, denting both and breaking the right rear window. Because the broken glass made the squad car unsafe, the officers called for a paddy wagon to transport Frazell.

When the paddy wagon arrived, the officers carried Frazell to it. He apparently had ceased to struggle by this point, although his hands and feet were still in restraints. Flanigan and Officer Fred Ball, the paddy wagon's driver, testified that Frazell had only a small cut or scrape on his lip when he was placed on foam padding in a narrow space in the back of the paddy wagon. Although Frazell apparently was uninjured, Flanigan told Ball to take Frazell to the hospital rather than to the county jail. Ball testified that while en route to the hospital, he could hear Frazell striking the paddy wagon's walls. When the back doors of the paddy wagon were opened at the hospital, Frazell was in the same position as when the doors had been closed, but he now had two deep cuts on his forehead and blood running down his face.

Dr. Sergio Castellon examined Frazell at Pekin Hospital's emergency room. The doctor's records indicate that Frazell was brought to the emergency room by six police officers and that his hands were cuffed and his legs strapped when he arrived. The records reveal that Frazell told the emergency room nurse that he had been pulled over by the police for driving without taillights but that he could not remember what happened next. Dr. Castellon's examination revealed two lacerations on Frazell's forehead that the doctor described as "full-thickness," meaning that all layers of Frazell's skin had been cut. Together, the cuts required twenty stitches to close. Frazell also had abrasions and bruises over much of the rest of his face, as well as multiple hematomas (bumps) on his scalp. The doctor found additional abrasions and bruises on Frazell's back and chest, including a mark in the lower back area that was shaped like a boot. At trial, the jury viewed photographs of Frazell taken a day or two after the incident that graphically depicted these injuries.

Upon leaving the hospital on the evening of June 4, Frazell was taken to the Tazewell County Jail, where he was examined by Dr. Nelson Wright (the jail's doctor) the following day. Dr. Wright discovered blood in Frazell's left ear and fearing a skull fracture, ordered that Frazell be returned to the hospital for a CAT scan. Although the CAT scan did not reveal a skull fracture, Dr. Wright referred Frazell to a neurosurgeon, who then kept Frazell in the hospital for three additional days. After his release, Frazell recuperated at home for approximately four to six weeks. He has suffered

from headaches, back pain, and numbness in his hands ever since.

Frazell and his wife Barbara also described for the jury a seizure Frazell had suffered in February 1985, approximately fifteen months before the incident at issue in this case. The two were unloading a truckload of firewood when Frazell dropped to the ground and began to shake. He attempted to grab onto the bottom of the truck and to pull himself under it. Frazell was taken to the emergency room, and he saw several doctors thereafter for treatment. He ultimately was diagnosed with epilepsy, for which he began to take anti-convulsion medication. Although this medication tended to prevent severe seizures like the one he suffered in February 1985, it did not prevent Frazell from having a series of lesser seizures between February 1985 and June 1986. After the June 4, 1986 traffic stop, moreover, Frazell suffered additional seizures and continues to receive treatment for his epilepsy to this date.

A doctor and a neuropsychologist who have treated Frazell over the years testified at trial that in their opinions, Frazell suffered an epileptic seizure during the June 4, 1986 traffic stop. Although such seizures generally last only a matter of minutes, the neuropsychologist explained that Frazell's seizure may have been prolonged and exacerbated by the treatment he received from the officers. The neuropsychologist observed that an individual in the midst of a seizure generally should be left alone, and he believed that Frazell's seizure probably ended only once the officers finally did so.

## II.

Flanigan contends that the judgment below must be reversed and a judgment entered in his favor as a matter of law for two reasons. First, he argues that the trial evidence is insufficient to support the jury's verdicts on the related claims of excessive force under the Fourth Amendment and a failure by Flanigan to protect Frazell from similar force employed by other officers. Even if we may consider the evidence sufficient, moreover, Flanigan asserts that the doctrine of qualified immunity shields him

from the jury's award of compensatory and punitive damages. We take up the sufficiency question first.

## A.

We review the district court's denial of Flanigan's motion for judgment as a matter of law de novo. *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir.1996). In determining whether the trial evidence is sufficient to support the jury's verdicts, we view that evidence in the light most favorable to the verdicts, resolving any conflicts in the evidence in Frazell's favor and granting him the benefit of all reasonable inferences. *McNabola*, 10 F.3d at 511. The ultimate question is whether the evidence would permit a reasonable jury to conclude that Flanigan violated Frazell's Fourth Amendment rights. *See Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1255 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1847, 134 L.Ed.2d 948; *McNabola*, 10 F.3d at 511.

Claims that a law enforcement officer used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard, which requires the court to balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 395–96, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985)); *see also Jones v. Webb*, 45 F.3d 178, 183 (7th Cir.1995). The right of a law enforcement officer to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The question that regularly confronts us in these cases is precisely how much force will be considered "objectively reasonable." That of course depends on the facts and circumstances of each case, but we generally look to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of

the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir.1996). We must consider the circumstances confronting the officer not through "the 20/20 vision of hindsight," but through the more immediate perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. As *Graham* explained:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 397, 109 S.Ct. at 1872 (internal quotation and citation omitted). The objective nature of the inquiry means that we disregard the officer's underlying intent or motivation. *See id.; Jones*, 45 F.3d at 183.

Flanigan contends that in light of these principles, no reasonable jury could have concluded that the force applied either by him or the other officers was unreasonable. Flanigan emphasizes that although Frazell initially appeared calm and cooperative when first arrested and placed in the squad car, he soon became an uncontrollable maniac who persisted in struggling with the officers. Once he was restrained and placed in the backseat of a caged squad car, moreover, Frazell allegedly broke out a window and kicked bulges into the car's roof and door. According to Flanigan, then, the force applied throughout the encounter was merely a measured response to Frazell's violent behavior. Flanigan argues that it was therefore objectively reasonable as a matter of law. We disagree.

■ Our review of the record reveals ample evidence from which a reasonable jury could have determined that the force applied by the officers was objectively unreasonable. We begin with the medical evidence, which was undisputed and particularly telling. The emergency room physician who examined Frazell found abrasions and bruises over much of his face and scalp, in addition to the two "full-thickness" cuts on his forehead that required twenty stitches to close. Frazell's back and chest were covered with additional abrasions and bruises, including a mark in the lower back area that was shaped like a boot. Disturbing photographs of Frazell depicted these and other injuries. The jury also heard that when the jail's doctor examined Frazell on the day after the incident, he believed that Frazell may have a fractured skull. He therefore ordered a CAT scan and referred Frazell to a neurosurgeon, who then kept Frazell in the hospital for three additional days.

In light of this undisputed evidence about the severity of Frazell's injuries, the primary questions for the jury were how, when, and in what circumstances the injuries were incurred. If the officers are to be believed, Frazell's injuries were largely self-inflicted, for at least two officers insisted that Frazell had been virtually unharmed when placed in the paddy wagon. Moreover, the two punches thrown by Officer Cates were the only blows to which the officers freely admitted. They consistently denied delivering or seeing the other blows to which Cooper, Henderson, and Frazell had testified. The jury apparently had difficulty accepting the officers' story, and we can certainly understand why. Frazell arrived at the hospital a bloody mess, after all, with two deep cuts on his forehead and with abrasions and bruises marking much of his body. Flanigan's response to this compelling evidence was to imply that Frazell may have injured himself through his own raucous behavior in the paddy wagon. But there was abundant evidence that undermined that defense. For example, there was evidence that Frazell had been placed on foam padding in a narrow space in the rear of the paddy wagon, and that he may not have moved at all during the trip to the hospital. Significantly, the evidence also showed that Flanigan had ordered Ball to take the allegedly "uninjured" Frazell to the emergency room, where he arrived with two bloody lacerations on his forehead and six law enforcement officers in tow. According to Cooper, of course, Frazell already had blood running down his face early in the

encounter—Cooper saw it during his second excursion from the van when he found Frazell face down on the pavement with three officers over him. Henderson also saw Flanigan and at least one other officer strike a subdued Frazell with a club or nightstick. A reasonable jury could have concluded from this evidence that the officers lied both about the extent of Frazell's injuries and the point at which they had been incurred. The jury could then have inferred that the officers also lied about other details of the encounter, even if no witness had been able to specifically refute their account. Such an inference, if drawn, would have been extremely significant in this case, for recall that the details of the encounter were provided largely by the officers themselves. Frazell could remember very little, and his two companions were hampered by having to remain in the van. On this record, a reasonable jury could certainly have concluded that Flanigan and the other officers were not credible witnesses. Consistent with the medical evidence, then, the jury could have determined that the officers had used force against Frazell far more frequently than they were willing to admit. If Frazell did not literally pound his head against the paddy wagon walls during his trip to the hospital, after all, he had to have incurred his injuries in some other way. Although Cooper and Henderson testified about certain blows, a reasonable jury could have concluded that those blows alone would not have accounted for Frazell's many injuries. Thus, the jury could· have concluded that there were additional blows to which Cooper and Henderson had been unable to testify.

Even putting aside that possibility for the moment, however, a reasonable jury could have concluded that the force to which Frazell, Cooper, and Henderson specifically testified was objectively unreasonable. Even if Frazell may have appeared to be fleeing when he rolled off the trunk of the squad car and attempted to scoot underneath it, the jury could have concluded that Flanigan acted unreasonably when he struck Frazell twice in the back with a club or nightstick once Frazell had effectively been subdued. Henderson testified that by the time Flanigan delivered those blows, Frazell was being restrained by three officers—one at his head, a second on his back, and a third at his feet. Frazell's hands were cuffed behind his back, and Cooper testified that he also saw restraints on Frazell's legs. A reasonable jury could have inferred from this evidence that Frazell had effectively been subdued, that he could not escape, and that he posed no danger to the officers when Flanigan drew back his club or nightstick and struck Frazell with it twice in the back. The jury could have deemed these blows completely gratuitous and therefore objectively unreasonable under the circumstances. *Cf. Rambo v. Daley,* 68 F.3d 203, 207 (7th Cir.1995) (objectively unreasonable for police officers "to force a handcuffed, passive suspect into a squad car by breaking his ribs"), *cert. denied,* —— U.S. ——, 116 S.Ct. 1546, 134 L.Ed.2d 649 (1996); *McDonald v. Haskins,* 966 F.2d 292, 295 (7th Cir.1992) (objectively unreasonable for police officer to hold his gun to the head of a nine-year-old child and threaten to pull the trigger when the child posed no threat to any officer on the scene).

A reasonable jury also could have found that Flanigan and the other officers persisted in striking Frazell while he remained in restraints on the ground. Approximately ten or fifteen minutes after Henderson saw the two blows delivered by Flanigan, Cooper left the van for a third time and told the officers, "You don't need to be hitting him like that. You guys are going to kill him." The officers denied that any additional blows were struck in this interval, but they also indicated that Frazell continued to struggle and to curse them. From Cooper's testimony and the aforementioned medical evidence, however, a reasonable jury could have concluded that the officers had continued to beat Frazell. The jury could have found that by continuing to strike Frazell once he had been subdued, the officers acted unreasonably.

There also is evidence from which a reasonable jury could have found that Frazell endured two additional blows to the lower back as he was being dragged or carried to the caged squad car. Henderson witnessed the blows from the backseat of the van. In a rare moment of consciousness, moreover, Frazell recalls that he was struck twice in

the lower back as he was being dragged across the pavement. The officers, on the other hand, indicated only that one of them may have struck Frazell's knuckles with a flashlight after Frazell had grabbed and would not release the officer's pant leg. The jury could have credited the testimony of Henderson and Frazell and found the two blows objectively unreasonable. There is no evidence to suggest that Frazell could have made any attempt to escape or to harm the officers in any way as he was being carried or dragged to the squad car. Frazell's hands and feet were in restraints at the time, and four officers were holding him.

We could go on but will not. Having determined that a reasonable jury could have rejected the officers' testimony on all material matters, it is then no great leap to conclude that such a jury could have found the officers' conduct objectively unreasonable under the circumstances. In defending his own conduct and that of his fellow officers, Flanigan can only point to Frazell's allegedly violent behavior, which he says prompted the officers to react. Yet it is one thing to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him. As we have outlined above, there is evidence in this record from which a reasonable jury could have determined that the latter is what occurred here. The fact that a certain degree of force may have been justified earlier in the encounter to restrain Frazell does not mean that such force still was justified once Frazell had been restrained. See Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir.1993).

As of yet, we have said nothing of the possibility that Frazell's allegedly violent behavior may have been caused by an epileptic seizure. We consider that a relevant but not necessarily dispositive factual issue in this case, for in our view, there is evidence from which a reasonable jury could have concluded that the officers acted unreasonably regardless of the explanation for Frazell's conduct. Alternatively, however, a reasonable jury could have found that Flanigan and the other officers knew that Frazell was having a seizure yet continued to treat him as someone who was resisting arrest. It may well be

true, as Flanigan asserts, that any law enforcement officer would have had difficulty recognizing the peculiar characteristics of the particular type of seizure Frazell apparently suffered. But a reasonable jury could have found that at least one officer had been told by Cooper early in the encounter that Frazell had a medical condition and was prone to seizures. Flanigan insists that he did not hear Cooper's statement and that he was never told of it. But a reasonable jury could have rejected those assertions and found that Flanigan in fact knew of Frazell's medical condition. Such a jury could then have concluded that Flanigan's conduct in the face of that knowledge was objectively unreasonable.

Flanigan addresses one final sufficiency argument to each of Frazell's claims. On the first, Flanigan contends that there is no evidence to indicate that he, as opposed to one of the other officers on the scene, used excessive force during the arrest. On the second claim—that he failed to protect Frazell from the excessive force applied by the other officers—Flanigan asserts that no evidence establishes that he had a realistic opportunity to intervene. See Thompson v. Boggs, 33 F.3d 847, 857 (7th Cir.1994) (officer accused of failing to take reasonable steps to protect the victim of another officer's excessive force must have had a "realistic opportunity" to prevent the attack), cert. denied, —— U.S. ——, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995); see also Hale v. Townley, 45 F.3d 914, 919 (5th Cir.1995) (same). Both contentions are easily answered. On the first, Henderson testified that it was Flanigan who struck Frazell twice in the lower back with a club or nightstick after Frazell had effectively been restrained by three officers. Based on this evidence alone, a reasonable jury could have concluded that Flanigan himself employed force that was objectively unreasonable under the circumstances. With respect to the second claim, the evidence indicates that Flanigan was the officer in control during the entire encounter. He was the arresting officer and was intimately involved in each of the relevant events. Flanigan, for example, was one of the three officers who held a handcuffed Frazell face down against the pavement early in the encounter while striking him. If the jury found that the other two

officers also delivered blows at this stage, it could have found that Flanigan had a reasonable opportunity to intervene. Furthermore, Flanigan also was involved in carrying or dragging Frazell to the caged squad car when another officer struck Frazell twice in the lower back. The jury could have found that Flanigan had a reasonable opportunity to prevent those blows. Indeed, the evidence suggests to us that Flanigan's own conduct set the tone for the entire encounter—he delivered the early blows and never attempted to dissuade his colleagues from following suit. A reasonable jury could have found that Flanigan failed to protect Frazell.

 Flanigan alternatively argues that he is entitled to a new trial because the jury's verdicts are against the weight of the evidence. The district court disagreed, and because a decision on that issue is committed to its discretion, we will disturb that decision only in the exceptional case of a clear abuse of discretion. *LaFollette v. Savage*, 63 F.3d 540, 543-44 (7th Cir.1995); *McNabola*, 10 F.3d at 516. Because we agree with the district court that the jury's verdicts are not against the weight of the evidence, we find no abuse of discretion in the district court's decision denying Flanigan a new trial.

### B.

 We turn finally to Flanigan's contention that he is shielded from the jury's damage awards by the doctrine of qualified immunity. Flanigan argues that immunity attaches here because Frazell has been unable to produce a closely analogous case clearly establishing that his actions during the encounter were in violation of the Fourth Amendment. To the extent that Flanigan's conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known," he would be immune from Frazell's damage claims. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir.1993). The immunity inquiry, like that on the merits under the Fourth Amendment, is objective. *See Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996). We are concerned not with the state of mind or good faith of the government actor, but with the "objective legal reasonableness" of his actions—in other words, with whether a reasonable police officer could have believed that Flanigan's conduct was constitutional "in light of clearly established law and the information [he] possessed" at the time. *Anderson v. Creighton*, 483 U.S. 635, 639, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987); *see also McDonald*, 966 F.2d at 293. A plaintiff generally may overcome the immunity defense in one of two ways: (1) by pointing to a closely analogous case establishing in a sufficiently particularized sense the right at issue; or (2) by showing that the force used was so plainly excessive under the circumstances that a reasonable officer would have known of the constitutional violation. *Clash*, 77 F.3d at 1048; *Rice*, 999 F.2d at 1174. Whether or not a defendant is entitled to qualified immunity is an issue that we consider de novo. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994).

 The instant case is somewhat unique, however, in that a jury already has determined that the force applied by Trooper Flanigan and the other officers was objectively unreasonable under the circumstances. At the very least, we are bound by the jury's resolution of disputed factual issues in assessing Flanigan's immunity defense. *See, e.g., Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1147 (9th Cir.1996) (jury decides foundational, historical facts that underlie qualified immunity determination), *cert. denied*, —— U.S. ——, 117 S.Ct. 514, 136 L.Ed.2d 403 (1996); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir.1995); *Posr v. Doherty*, 944 F.2d 91, 95-96 (2d Cir.1991). Yet in addition to that, a number of circuits have indicated that a jury's finding on the Fourth Amendment question effectively resolves the immunity issue as well, because both questions turn on whether the officer's conduct was objectively reasonable under the circumstances. Those circuits reason that once a jury has determined under the Fourth Amendment that the officer's conduct was objectively unreasonable, that conclusion necessarily resolves for immunity purposes whether a reasonable officer could have be-

lieved that his conduct was lawful. *See, e.g., Acosta,* 83 F.3d at 1147–48; *Rowland v. Perry,* 41 F.3d 167, 173–74 (4th Cir.1994); *Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995); *Wardlaw v. Pickett,* 1 F.3d 1297, 1303 (D.C.Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994); *Posr,* 944 F.2d at 96; *Street v. Parham,* 929 F.2d 537, 540–41 (10th Cir.1991); *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir.1989); *see also Mick v. Brewer,* 76 F.3d 1127, 1135 n. 5 (10th Cir. 1996); *Roy v. Inhabitants of the City of Lewiston,* 42 F.3d 691, 695 (1st Cir.1994). *Titran v. Ackman,* 893 F.2d 145, 146 (7th Cir.1990), takes this circuit in that direction as well, for we intimated there that because an individual's right under the Fourth Amendment "to be free of excessive force during an arrest has long been established," a finding that too much force was used "logically dispose[s]" of the qualified immunity question. *But cf. McDonald,* 966 F.2d at 293 (calling the relationship between the excessive force and qualified immunity tests "somewhat uncertain").

In the circumstances of this case, we agree that the jury's excessive force verdict effectively forecloses Flanigan's immunity defense. Bearing in mind that it was clearly established in 1986 that a police officer would violate the Fourth Amendment by employing excessive force during an arrest (*see, e.g., Ellis,* 999 F.2d at 246), Flanigan would not be entitled to immunity unless he could convince us that it was objectively reasonable at the time for him to believe that his conduct was lawful. *See Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40. After resolving the many disputed factual issues in this case, however, the jury found that a reasonable police officer in Flanigan's position would not have believed that the force employed by Flanigan and the other officers was justified under the circumstances. That conclusion means that, as a legal matter, Flanigan's immunity defense must fail. *See Acosta,* 83 F.3d at 1147, 1148; *Posr,* 944 F.2d at 95–96; *Street,* 929 F.2d at 540–41; *Brandenburg,* 882 F.2d at 215–16; *see also Titran,* 893 F.2d at 146.

## III.

Having determined that the jury's verdicts are supported by the trial evidence and that Flanigan is not shielded from the jury's damage awards by the doctrine of qualified immunity, we affirm the judgment for Frazell.

AFFIRMED.